1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SHAWN PETERSEN,

                        Plaintiff,

        v.

DEPUTY MATTHEW SMITH, et al.,

                        Defendants.

CASE NO. C19-6033-BHS-MAT

REPORT AND RECOMMENDATION

INTRODUCTION

Plaintiff Shawn Petersen proceeds with counsel in this 42 U.S.C. § 1983 civil rights action brought against Pierce County Sheriff's Department (PCSD) Deputy Mathew Smith and Pierce County.  (Dkt. 16.)  Plaintiff alleges Smith violated his First and Fourth Amendment rights by limiting his right of free speech and his right to be free from arrest without probable cause or excessive use of force.  He alleges Pierce County, through its policy regarding the use of "vascular neck restraint" (VNR), was the moving force behind and ratified Smith's excessive force.

Three motions are currently pending before the Court.  Defendants' Motion for Summary Judgment (Dkt. 28) seeks dismissal of all of plaintiff's claims and requests for relief based on an absence of any constitutional violation or municipal liability and Smith's entitlement to qualified

REPORT AND RECOMMENDATION
PAGE - 1

immunity.  Plaintiff's two pending motions seek partial summary judgment in relation to the VNR policy and as to probable cause for his arrest for obstruction.  (Dkts. 22 & 34).  All three motions are opposed (Dkts. 33, 38-39), and plaintiff requests oral argument (Dkts. 34 & 39).  The Court, having considered the motions, responses, materials in support and opposition, and the remainder of the record, finds oral argument unnecessary and recommends the motions be DENIED.

BACKGROUND

A.      Use of Force

At around 9:45 p.m. on May 23, 2019, Deputy Smith, accompanied by a ride-along passenger, was on patrol in rural Pierce County when he observed an oncoming vehicle cross the road's centerline.  (Dkt. 30 (Decl. of Matthew Smith), ¶3.)  Smith turned his patrol car around and the driver of the suspect vehicle pulled over in front of plaintiff Shawn Petersen's home.  (*Id.*)  Smith pulled in behind the vehicle, with the passenger side of his car at the base of plaintiff's driveway and emergency lights activated, and approached the vehicle's driver's side.  (*See id.*, ¶4.)

1.      Video Evidence:

A front door security camera video shows plaintiff stepped outside and began to verbally engage with Smith, asking him to do the stop someplace else and turn his lights off, and noting plaintiff's child was sleeping.  (Dkt. 23 (Decl. of Mika Rothman), Ex. 12.)  Smith refused and plaintiff asked Smith to get his supervisor, provide his card, and get off plaintiff's property, while Smith told plaintiff to stay inside his house and "get out of my stop."  Plaintiff returned to his house, quickly reemerged with his cellphone, and walked at least halfway down his driveway.

A second, cell phone video recording starting some sixty seconds into the incident shows plaintiff and Smith continued their exchange, simultaneous to Smith's ongoing interaction with the stopped driver.  (*Id.*, Ex. 13.)  After thirty to forty-five seconds, Smith walked back to his patrol

REPORT AND RECOMMENDATION
PAGE - 2

car, told Petersen to stop interfering, and sat down in the driver's seat.  After another thirty seconds, plaintiff took several steps towards the patrol car and Smith emerged from the car and walked towards plaintiff with a small piece of paper in his hand.  Plaintiff told Smith he was trespassing and to get off his property, while Smith appeared to say, ". . . if you approach my car again . . . get back inside", put the paper in his pocket, and, when close to plaintiff, said, "you're going in cuffs right now."  Plaintiff responded, "No", and the view from the camera abruptly and repeatedly shifts during a physical interaction not visible on the recording and ending on the ground.

2.    <u>Smith's Depiction of Events</u>:

Smith asserts that, while ignoring commands to stop interfering and hindering/delaying the investigation into a suspected impaired driver, plaintiff did not initially pose a significant enough risk to cause Smith to deviate from concluding the traffic stop.  (Dkt. 30, ¶6.)  Smith determined the driver of the stopped vehicle was not impaired and had swerved during an attempt to retrieve food that had fallen on the floor.  (*Id.*, ¶7.)  However, there was "still some stuff that needed to be done" before concluding the stop.  (*Id.*)  Smith also at some point called for backup.  (Dkt. 40 (Second Decl. of Joe Shaeffer), Ex. 3 at 2-3; Dkt. 45 (Decl. of Detective Tim Donlin), ¶3.)

Smith asserts that, when plaintiff began to approach the patrol car, Smith noticed "what appeared to be a folding knife" in plaintiff's front pocket, as he "could see the outline of the knife and the clip outside of his pocket."  (Dkt. 30, ¶8.)  Plaintiff had an unobstructed path to the citizen observer in the patrol car.  Smith contends the circumstances were tense and rapidly evolving, forcing Smith to make a split-second decision, and that plaintiff hindered, delayed, and stopped Smith from completing his investigation and willfully distracted him from his law enforcement duties, providing probable cause for obstruction.  (*Id.*, ¶9.)

Smith further asserts that, when told he was going into handcuffs, plaintiff "turned, pulled

REPORT AND RECOMMENDATION
PAGE - 3

his arm away, and started to proceed towards the front door of the residence while actively resisting arrest." (*Id.*, ¶10.)  Smith pursued and tackled plaintiff, and explains:

> It was dark outside. I was a solo officer and had no immediate back up. I was concerned with Mr. Petersen's proximity to weapons, the safety of my ride-along, and a still yet unresolved traffic stop. Mr. Petersen's behavior was erratic, already showed he had a knife, already demonstrated his potentially threatening behavior and failure to follow commands. . . . I was worried about what might happen next. There was a potential threat by Petersen returning to his home where he may potentially have access to more weapons.

(*Id.*)  Once plaintiff was on the ground, Smith began to administer a VNR, but plaintiff "continued to actively resist by trying to get up and struggle to get free." (*Id.*)   Because plaintiff refused a command to "'stop resisting'", Smith tightened his grip and plaintiff quickly lost consciousness. (*Id.*)  Smith decided to use VNR in order to quickly secure the scene to protect his passenger, the stopped driver, and plaintiff, and deemed it a more appropriate level of force than a potentially painful taser, OC spray, or baton.  (*Id.*, ¶13.)

 3. <u>Plaintiff's Depiction of Events</u>:

Plaintiff explains his requests to Smith as based on fear for the safety of himself and his family.  (Dkt. 23, Ex. 11 ("I don't know what is going to occur at any traffic stop, so I didn't want it to occur right in front of my house, if anything was to happen."))  In the moments leading up to the use of force, plaintiff saw the paper in Smith's hand and thought he was approaching with his business card.  (Dkt. 40, Ex. 2 (Petersen Dep.) at 37:7-13, 19-20).)  Smith, instead, told him he was going in cuffs, reached for his arm, brushed his hand, lunged at, and tackled him.  (*Id.* at 44:4-16; Dkt. 42 (Decl. of Shawn Petersen), ¶3).)  Plaintiff does not recall whether he pulled his arm away, but denies he turned to go back to his house, explaining he went into a defensive, prone position when tackled, and fell towards the grass, avoiding the concrete.  (Dkt. 40, Ex. 2 at 44:17-

REPORT AND RECOMMENDATION
PAGE - 4

45:25; Dkt. 42, ¶3.)  Plaintiff attests:

> I landed on my stomach and both of my arms were trapped underneath my body. Deputy Smith immediately jumped onto my back. At that point, the weight of both my and Deputy Smith's bodies pinned my arms between the ground and my stomach.
>
> Deputy Smith tried to pry my arms out from under my body, but my arms were stuck under our bodyweight and would not move. Deputy Smith kept yelling "stop resisting!" but there was nothing I could do because I could not physically get my arms out from underneath both of our bodies.  I was not physically resisting in any way – either by intentionally keeping my arms out of Deputy Smith's reach or by moving other body parts.
>
> Deputy Smith yanked at my arms for a few more seconds, then put me in a headlock.  I remember everything going white and seeing my son's face.  The next thing I remember was lying on the ground, in handcuffs, with Deputy Smith's knee on the back of my neck.

(Dkt. 42, ¶¶3-5; *accord* Dkt. 40, Ex. 2 at 46:4-14.)

B.     Subsequent Events

Smith arrested plaintiff after he regained consciousness, called for an ambulance, and began a two-hour observation period given the loss of consciousness.  (Dkt. 30, ¶11.)  Plaintiff told medics at the scene he was not injured and refused an evaluation.  (*Id.*, ¶14.)  He later sought medical care for neck and throat pain continuing approximately two weeks after the incident.  (Dkt. 25 (First Decl. of Dr. William Smock), ¶ 8(d-e).)  An examination and x-rays were normal and plaintiff did not appear for a CAT scan.  (Dkt. 29 (Decl. Nancy A. Becker, D.O.), Ex. 5.)

A sergeant and lieutenant both found Smith's use of force appeared to be reasonable.  (Dkt. 23, Ex. 17 at 5.)  Plaintiff filed a complaint, prompting an investigation.  (Dkt. 40, Ex. 3.)  In witness statements, the citizen observer stated plaintiff pulled away from Smith, "tried running away" and "continued to resist", while the stopped driver stated: "After many warnings to back off the officer took down the man, and got him subdued."  (Dkt. 45, ¶3 & Ex.)  A detective closed

REPORT AND RECOMMENDATION
PAGE - 5

the investigation as exonerated, finding the force used "appears to have been lawful, justified and proper." (Dkt. 40, Ex. 3 at 3.)

The criminal complaint filed against plaintiff included one count of obstructing a law enforcement officer (gross misdemeanor), by unlawfully, willfully hindering, delaying or obstructing an officer's discharge of official duties, contrary to RCW 9A.76.020(1), and one count of resisting arrest (misdemeanor), by intentionally preventing or attempting to prevent Smith from lawfully arresting him, contrary to RCW 9A.76.040(1). (Dkt. 23, Ex. 14.) However, on August 2, 2019, a Pierce County Deputy Prosecuting Attorney decided to drop the charges after viewing the video evidence. (*Id.*, Ex. 15.) He believed the videos prevented proving the case beyond a reasonable doubt and that the conduct depicted did not rise to the level of obstruction. (*Id.*)

C.    Pierce County VNR Technique

The VNR or lateral VNR (LVNR) technique used by Pierce County involves bilateral compression of the neck, compressing the carotid arteries (which supply blood to the brain), the jugular veins (which return blood from the brain to the heart), and the carotid sinus (which measures and regulates blood pressure of the brain). (Dkt. 23, Ex. 8 at 8).) PCSD policy allows the use of VNR as a "non-deadly force application" by officers who have completed initial and annual training and recertification on the technique. (*Id.*, ¶5, Ex. 5.) The policy differs from a draft version provided to PCSD by Lexipol, LLC, which allowed for carotid restraint by authorized officers only "when the deputy reasonably believes that the application of the hold appears necessary to prevent serious injury or death to a deputy or other person(s)." (*Id.*, ¶6, Ex. 6.)[1]

---

[1] Both the policy in effect and the draft include the copyright of Lexipol, LLC (Dkt. 23, Exs. 5 & 6), a private entity offering "comprehensive, continuously updated policies for public safety agencies", training, and other services, *see* https://www.lexipol.com/about/.

REPORT AND RECOMMENDATION
PAGE - 6

PCSD authorizes two levels of VNR to gain compliance, both of which are deemed non-deadly force. (*Id.*, ¶7, Ex. 7 (Sgt. Jason Youngman Dep.) at 64:14-19 & Ex. 8 at 14; Dkt. 31 (Decl. of Sgt. Youngman), ¶¶4-5.)  VNR level I entails application of a control hold – putting an arm around the subject's neck – without any intentional compression of carotid arteries and veins. (Dkt. 23, Ex. 7 at 34:8-35:1.)  VNR level II entails actual compression/application of bilateral pressure to the sides of the neck.  (*Id.* at 35:2-4.)  If a subject resists at level I, level II provides for "maximum arrest" of arterial and vascular blood flow and cerebral circulation.  (*Id.*, Ex. 8 at 20-21 & Ex. 7 at 35:11-13.)  Unconsciousness may occur at either level, but is "not the goal"; the goal is to "gain compliance of an actively resistive or combative offender."  (*Id.*, Ex. 8 at 20-21; Dkt. 31, ¶5.)  Once a subject complies at level II, pressure is released and the technique is reduced to level I.  (Dkt. 23, Ex. 8 at 15 & Ex. 7 at 35:5-10.)  Unconsciousness occurs within four-to-seven seconds of maximum compression and, when unconsciousness is attained, the policy requires medical evaluation and a two-hour observation period.  (Dkt. 23, Ex. 5 & Ex. 8 at 15, 20.)

Sergeant Jason Youngman, PCSD Lead Defensive Tactics Instructor, states deputies are trained that, if the VNR hold continues for ten-to-fifteen seconds, they should consider the technique ineffective and transition to another option if resistance continues.  (Dkt. 31, ¶¶2, 5.)  He distinguishes VNR from a prohibited "'chokehold'", which involves directly compressing the larynx and trachea, and opines VNR is not deadly force, has been proven safe and effective, and, when employed consistent with training, does not carry a reasonable risk of death or serious bodily injury.  (*Id.*, ¶¶5-6.)  He states "[m]edical research puts the time the brain can survive without blood flow at about 4-6 minutes[,]" pointing to a study finding no deleterious effects with blood flow cut off via the carotid arteries for up to 100 seconds.  (*Id.*)  Youngman attests the technique is typically in place for no more than ten-to-fifteen seconds, in many cases for less time, and that

REPORT AND RECOMMENDATION
PAGE - 7

"often no compression is applied" due to a subject's compliance.  (*Id.*)

Youngman also provides a study conducted by PCSD, reviewing all VNR applications from 2016 to 2019 and showing 330 uses, with "zero reports of injuries attributed to the VNR." (Dkt. 31, ¶7; Dkt. 49.)  According to Youngman, the study shows over half (53%) of cases resulted in no loss of consciousness and none of the fifty-four total injuries reported "were able to be attributed to the use of the VNR itself."  (*Id.*)  In eighty cases (24%), the subject was transported to the hospital, but not for concerns related to the use of VNR.

D.      Plaintiff's VNR Evidence

Dr. William Smock, a medical doctor and police surgeon, attests:

> "Strangulation" is a form of asphyxia characterized by the closure of the blood vessels or the air passages or both as a consequence of the application of external pressure applied to the neck. Asphyxia is any condition in which human tissue is deprived of oxygen. [Brain cells are the most sensitive] to the lack of oxygen and will begin to die within seconds when deprived of oxygenated blood. The application of a carotid vascular restraint is physiologically identical to a strangulation assault with occlusion of arterial blood flow; both create an anoxic (no oxygen) environment within the brain.

(Dkt. 25, ¶2.)  Only a minimal amount of pressure is needed to compress and occlude vessels in the neck.  (*Id.*, ¶¶2-3.)  Compression of the carotid arteries occludes eighty-to-eighty-five percent of blood flow to the brain and the bilateral carotid artery compression used with VNR, also called carotid restraint, renders an adult male unconscious in five-to-thirteen seconds.  (*Id.*, ¶3.)

Dr. Smock depicts the use of VNR, including the PCSD technique, as well known to carry the risk of serious physical injuries (including cartilage fractures, vertebral and carotid artery dissections, strokes, and brain damage) and death.  (*Id.*, ¶3, 8(f), Exs. 1-3.)  He opines VNR should be reserved for lethal/deadly force encounters only, consistent with restrictions or total bans on

REPORT AND RECOMMENDATION
PAGE - 8

use in many other police departments.  (*Id.*, ¶¶4-8, Exs. 1-5; Dkt. 23, Exs. 1-4; Dkt. 47, Ex. 1.)

Dr. Smock opines plaintiff was assaulted and sustained a serious bodily injury by the application of VNR, which rendered him unconscious and deprived his brain of oxygenated blood. (Dkt. 25, ¶8(a-b).)  He further opines plaintiff did not receive appropriate medical care while in custody given the absence of any effort to rule out potential serious and life-threatening internal injuries, which can cause stroke and death days, weeks, to months after VNR.  (*Id.*, ¶8(c).)

DISCUSSION

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving party will have the burden of proof at trial, the moving party can carry its initial burden by either producing evidence that negates an essential element of the non-moving party's claim, or by establishing the absence of evidence to support an essential element of the non-moving party's claim.  *James River Ins. Co. v. Herbert Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir. 2008); *Soremekun*, 509 F.3d at 984 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

No genuine issue of material fact exists where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").   Conversely, a genuine dispute exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson*, 477 U.S. at 253.  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  The Court must draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87.

B.    Section 1983 Claim Standards

        Plaintiff brings claims under 42 U.S.C. § 1983.  With a § 1983 claim, plaintiff must show (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) that the violation was proximately caused by a person acting under color of state or federal law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

        Under the doctrine of qualified immunity, state officials "performing discretionary functions [are protected] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining whether qualified immunity applies, the Court considers whether the plaintiff alleged sufficient facts to make out a violation of a constitutional right, and whether the constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").  "'A clearly established right is

REPORT AND RECOMMENDATION
PAGE - 10

one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  In considering qualified immunity at the summary judgment stage, the Court considers the facts alleged in the light most favorable to the party asserting injury.  *Scott v. Harris*, 550 U.S. 372, 377-78 (2007); *Longoria v. Pinal Cty.*, 873 F.3d 699, 704 (9th Cir. 2017).

"[M]unicipalities do not enjoy immunity from suit – either absolute or qualified – under § 1983."  *Leatherman v. Tarrant Cty. Narcotics Intel. and Coordination Unit*, 507 U.S. 163, 166 (1993) (citing *Owen v. City of Indep., Mo.*, 445 U.S. 622, 638 (1980)).  To establish municipal liability, plaintiff must show a "policy or custom" led to the injury.  *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor.  *Id.* at 691-94.  Liability must rest on the actions of the municipality, not on the actions of an employee.  *Bd. of the Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 403 (1997).  A claim may involve implementation of official polices or established customs inflicting the injury, omissions or failures to act amounting to a policy of deliberate indifference to constitutional rights, or ratification of a subordinate's unconstitutional conduct by an official with final policy-making authority.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), *overruled in part on other grounds in Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

C.    <u>Summary Judgment Motions</u>

1.    <u>VNR as Deadly Force</u>:

Plaintiff's first motion for partial summary judgment addresses VNR.  He seeks an order concluding (1) application of a VNR hold constitutes "deadly force"; (2) Smith violated plaintiff's

REPORT AND RECOMMENDATION
PAGE - 11

Fourth Amendment rights by using the VNR hold and rendering him unconscious in a non-deadly force situation (Dkt. 23, Ex. 15 at 58:24-59:7 (Smith testified the encounter did not warrant the use of deadly force)); and (3) Pierce County policy authorizing VNR in non-deadly force situations caused the constitutional violation, thereby establishing municipal liability.  (Dkt. 22.)

In the Ninth Circuit, deadly force is "force that creates a substantial risk of causing death or serious bodily injury."  *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005) (en banc). Similarly, in Washington, deadly force "means the intentional application of force through the use of firearms or any other means reasonably likely to cause death or serious physical injury."  RCW 9A.16.010(b).  *See also* RCW 9A.16.040(2) (to use deadly force, an "officer must have probable cause to believe that the suspect, if not apprehended, poses a threat of serious physical harm to the officer or a threat of serious physical harm to others.")

Plaintiff proffers expert evidence from Dr. Smock that VNR carries a substantial risk of causing death or serious bodily injury and that its use should be reserved for lethal/deadly force encounters.  (Dkt. 25; Dkt. 37 (Second Decl. of Dr. Smock).)  Dr. Smock relies on his medical expertise, medical and forensic literature, and the fact numerous law enforcement agencies either ban VNR or restrict its use for lethal force encounters.  (*See, e.g.*, Dkt. 25, ¶4 ("Recent research conducted by the Las Vegas Metro Police Department regarding the use of [VNR] on suspects showed that a majority of law enforcement agencies surveyed have either banned the practice outright or reserved for situations requiring lethal force situations only."), and Ex. 6 (former King County chief medical examiner: "Use of neck holds (by police officers) must be viewed in the same way as firearms; the potential for a fatal outcome is present each time a neck hold is applied and each time a firearm is drawn from its holster. The neck hold differs in that its fatal consequence can be totally unpredictable."))

REPORT AND RECOMMENDATION
PAGE - 12

For example, the Olympia Police Department identifies carotid restraint/LVNR holds as unauthorized practices, while the Seattle Police Department prohibits neck and carotid restraints, or any technique used to control or disable a subject by applying pressure to the carotid artery, jugular vein, or sides of the neck to control movement or render a subject unconscious by restricting blood flow.  (Dkt. 23, Exs. 1-2; Dkt. 25, ¶7.)  The King County Sheriff's Department prohibits "any physical application or maneuver to the neck region that restricts blood or air flow (i.e., choke holds, sleeper holds, carotid submission holds, [LVNR], etc.), except as a last resort to protect . . . from an immediate threat of death or serious bodily injury" and states "[a]ny and all variations of these maneuvers may be considered deadly force when applied to the neck region." (Dkt. 23, Ex. 3; Dkt. 25, ¶7.)  The Bellevue Police Department prohibits VNR "for any situation in which deadly force is not justified."  (Dkt. 23, Ex. 4; Dkt. 25, ¶7.)[2]

Plaintiff also challenges the defendants' evidence.  Defendants, for example, offer Sergeant Youngman's opinion VNR is not deadly force and, when employed consistent with training, does not carry a reasonable risk of death or serious bodily injury.  (Dkt. 31, ¶6.)  He states the brain can survive without blood flow for four-to-six minutes, and that the PCSD technique is typically in place for no more than ten-to-fifteen seconds, often for less time and without any  compression. The PCSD study, co-authored by Youngman and another PCSD employee, found no injuries attributed to the use of VNR in 330 applications.  (*Id*., ¶7; Dkt. 49.)

---

[2] Other police departments have adopted similar restrictions or bans.  (Dkt. 25, ¶5, Ex. 4 (Louisville Metro Police Department allows the use of "Choking techniques (i.e. vascular restraints)" only "in a situation where the use of deadly force would be allowed."); ¶6, Ex. 5 (Syracuse Police Department prohibits any application of force or pressure to the neck creating a substantial risk of restricting breathing or circulation of blood to and from the brain "unless it is reasonable to believe there is an imminent threat of serious physical harm or death to an officer or a third person.")); *see also* Dkt. 47, Ex. 1 (Massachusetts law effective December 31, 2020 prohibits chokeholds, LVNR, carotid restraint "or other action that involves the placement of any part of law enforcement officer's body on or around a person's neck in a manner that limits the person's breathing or blood flow."))

REPORT AND RECOMMENDATION
PAGE - 13

Plaintiff argues Youngman's declaration should be accorded no weight because he is not qualified with a medical degree or other education to opine as to the medical risks or complications of VNR. (Dkt. 37, ¶¶1-2 (noting Youngman is designated a Rule 30(b)(6) witness on use of force policies, practices, customs, training, and compliance and consistency of use of force in this case). Plaintiff likewise contends the PCSD study should receive no weight, noting the absence of peer review, inaccuracies, and other deficiencies, such as a lack of follow-up or evidence of necessary medical testing. (*See, e.g.*, Dkt. 25, ¶8 (appropriate medical care after VNR includes efforts to rule out carotid and vertebral artery dissections, which can cause stroke and death months after application); Dkt. 37, ¶¶4-5 ("[T]he moment the subject loses consciousness from the vascular restraint's induced anoxic insult, the brain is deprived of oxygenated blood and brain cells begin to die."; "Anoxic brain death, defined as the cessation of respiratory effort, occurs between 1 and 2.5 minutes of continued pressure on the carotid arteries from the blocking of blood flow to the brain.")) Plaintiff asserts his entitlement to summary judgment given the unrebutted medical testimony and evidence that VNR constitutes deadly force.

Defendants assert the need to analyze the use of VNR and the Fourth Amendment claim of excessive force under the reasonableness standard and framework outlined by the Supreme Court in *Graham v. Conner*, 490 U.S. 386 (1989). That is, as addressed below in relation to plaintiff's claims against Smith, the Court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake." *Id*. at 396 (citations omitted). *See also Bryan v. MacPherson*, 630 F.3d 805, 823-25 (9th Cir. 2010) ("Stated another way, we must 'balance the amount of force applied against the need for that force.'"; "Non-lethal . . . is not synonymous with non-excessive; all force—lethal and non-lethal—must be justified by the need for the specific level of force employed. . . .   Nor is 'non-

lethal' a monolithic category of force. A blast of pepper spray and blows from a baton are not necessarily constitutionally equivalent levels of force simply because both are classified as non-lethal. Rather than relying on broad characterizations, we must evaluate the nature of the specific force employed in a specific factual situation.") (quoted source and internal citations omitted).

Defendants argue the manner in which VNR is employed by PCSD, and as used by Smith, is not reasonably likely to cause death or serious physical injury.  They argue the use of VNR is consistent with other pain compliance techniques courts have found to involve a less significant intrusion on an individual's personal security, even when causing pain and injury, such as arm-twisting, pepper spray, and tasers.  (Dkt. 33 at 7 (citing cases).)  The Ninth Circuit has, for example, deemed tasers and stun guns non-lethal force even though their use can result in death.  *Bryan*, 630 F.3d at 825-26 (concluding tasers "constitute an 'intermediate or medium, though not insignificant, quantum of force' . . . that must be justified by the governmental interest involved.").

In *Hunter v. Durell*, C16-1445-MJP, 2018 WL 6249789 (W.D. Wash. Nov. 29, 2018), this Court considered the use of LVNR in assessing qualified immunity after a jury verdict found an officer guilty of excessive force.  The Court found that, as with a chokehold that cuts off airflow, "a reasonable officer also would have understood that an LVNR could constitute deadly force, such that its use should be thoughtfully prescribed."  *Id*. at *11 (citing, *inter alia*, *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) (an officer, or any reasonable person, "should have known that squeezing the breath from a compliant" individual "involves a degree of force that is greater than reasonable."))  Considering the relevant facts and circumstances in that case, the Court found the officer was not entitled to qualified immunity "[b]ecause a reasonable officer would have known that it violated clearly established law to use a neck restraint on a non-resisting suspect, and because it would have been obvious that such use of

REPORT AND RECOMMENDATION
PAGE - 15

force was unreasonable under *Graham*[.]" *Id.* at *11-12.

The Ninth Circuit affirmed the decision in *Hunter*, concluding: "We have characterized as serious – that is, non-trivial – any force that is capable of causing death or serious injury, and extensive expert testimony here confirmed that the chokehold technique . . . employed against Hunter could have caused death or serious injury." *Hunter v. City of Fed. Way*, No. 18-35666, 2020 WL 1172732, at *1 (9th Cir. Mar. 11, 2020) (internal citation to *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001)). The court pointed to its recent decision in *Tuuamalemalo v. Greene*, 946 F.3d 471, 475, 477 (9th Cir. 2019), a case also involving LVNR and recognizing that, "at least as early as January 25, 2014, '[t]here is robust consensus among the circuits that the use of a chokehold on a non-resisting person violates the Fourth Amendment.'" *Id.*[3]

More recently, in *Estate of Farmer v. Las Vegas Metro. Police Dep't*, C18-0860, 2020 WL 5763607, at *12-14 (D. Nev. Sept. 28, 2020), a district court addressed a policy authorizing the use of LVNR in "low-level force situations," and contrasted plaintiff's evidence LVNR could create the potential for serious injury or death if applied incorrectly, with uncontroverted expert reports opining as to the safety of LVNR properly applied under departmental policy and "its appropriateness for low-level force situations." The court found an absence of a genuine dispute of material fact or support for a finding "LVNR is itself so dangerous that authorized use in low-

---

[3] In an earlier case, the Ninth Circuit declined to decide whether a district court properly determined a carotid hold constituted deadly force. *Nava v. City of Dublin*, 121 F.3d 453, 458 (9th Cir. 1997), *overruled on other grounds in Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999)). Other district courts have found carotid restraint to constitute a severe intrusion on Fourth Amendment rights, *see, e.g., Brown v. Grinder*, C13-1007, 2019 WL 280296, at *9 (E.D. Cal. Jan. 22, 2019); found a reasonable jury could conclude a carotid restraint constituted deadly force, *Ayala v. City of S. San Francisco*, C06-2061, 2007 WL 2070236, at *7 (N.D. Cal. July 13, 2007); or considered how the hold was applied, *see Rascon v. Brookins*, C14-0749, 2018 WL 783675, at *10 (D. Ariz. Feb. 8, 2018) (use of carotid hold "may constitute a significant use of force and threatens serious injury when applied multiple times."); *Ericson v. City of Phoenix*, C14-1942, 2016 WL 6522805, at *13 (D. Ariz. Nov. 3, 2016) ("carotid restraint or hold can result in great bodily injury if the hold is in place long enough.").

REPORT AND RECOMMENDATION
PAGE - 16

level force situations can support municipal liability." *Id*.  The court also distinguished the decision in *Valenzuela v. City of Anaheim*, C17-0278, 2019 WL 2949035, *10 (C.D. Cal. Feb. 12, 2019), where the policy itself acknowledged the risk of injuries with carotid restraint and the department's own Office of Independent Review had specifically recommended it be "used only when the use of deadly force is objectively reasonable." *Id*.

The use of VNR/LVNR constitutes, at least, a serious use of force in that it may cause death or serious injury.  *Hunter*, 2020 WL 1172732, at *1.  Plaintiff seeks a ruling that the LVNR technique authorized by Pierce County constitutes deadly force which, under federal and state law, creates a substantial risk of or is reasonably likely to cause death or serious injury.  *Smith*, 394 F.3d at 693; RCW 9A.16.010(b).  The parties present conflicting evidence about the PCSD policy. Plaintiff provides compelling evidence as to the medical implications of VNR as a general matter and raises legitimate questions as to the weight properly afforded defendants' evidence. Defendants present evidence specific to the technique employed by PCSD officers and in support of their contention its proper application is not reasonably likely to cause death or serious injury.

"Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations." *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005).   In this case, given the conflicting evidence, it is not clear the Court can or should resolve the determination sought by plaintiff. *Estate of Farmer*, 2020 WL 5763607, at *12-13 (granting summary judgment for defendant as to any argument by plaintiff that a policy allowing for use of LVNR in low-level force situations "alone gives rise to municipal liability."); *Ericson v. City of Phoenix*, C14-1942, 2016 WL 6522805, at *3-4 (D. Ariz. Nov. 3, 2016) (finding differing areas of expertise in relation to the role of strangulation in decedent's death "are perhaps germane to the weight and allowed scope" of testimony, but did not bar admissibility) (citing *Bergen v. F/V St. Patrick*, 816 F.2d 1345,

REPORT AND RECOMMENDATION
PAGE - 17

1352 n.5 (9th Cir. 1987) ("The weakness in the underpinnings of [expert] opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony.")) For this reason, plaintiff's request for a ruling that VNR necessarily constitutes deadly force and subjects Pierce County to liability, and the related requests, should be denied.

      2.   <u>Probable Cause for Obstruction and Related Claims</u>:

In his second motion for partial summary judgment, plaintiff contends Smith did not have probable cause to arrest him for obstructing a law enforcement officer and that no reasonable officer could have believed otherwise. He argues the arrest for obstruction improperly criminalized protected speech unaccompanied by any conduct, and seeks entry of a judgment of unreasonable seizure without probable cause in violation of the Fourth Amendment. (Dkt. 34.) Defendants oppose plaintiff's motion and, in their own motion, seek dismissal of plaintiff's First Amendment and Fourth Amendment unreasonable seizure claims. (Dkts. 28 & 38.)

The First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461 (1987) (finding city ordinance making it unlawful to interrupt police officer in performance of duties unconstitutionally overbroad). *See also Duran v. Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("[W]hile police . . . may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment."; finding officer lacked probable cause to stop an individual based on obscene gestures and words directed from car). The Supreme Court has, therefore, "consistently held that the First Amendment protects verbal criticism, challenges, and profanity directed at police officers unless the speech is 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'"

REPORT AND RECOMMENDATION
PAGE - 18

*United States v. Poocha*, 259 F.3d 1077, 180 (9th Cir. 2001) (quoting *Hill*, 482 U.S. at 461).  *See also State v. E.J.J.*, 183 Wn. 2d 497, 507, 534 P.3d 815 (2015) ( "Obstruction statutes may not be used to limit citizens' right to express verbal criticism, even abusive criticism, at police officers.")

The Fourth Amendment guarantees the right to be free from unreasonable search and seizure.  "Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  Conclusive evidence of guilt is not necessary, nor is mere suspicion or rumor sufficient.  *Id.*  Rather, probable cause to arrest exists if "the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing [an individual] had committed or was committing an offense."  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  There must be, under the totality of the circumstances, a fair probability or substantial chance the individual committed a crime.  *Lopez*, 482 F.3d at 1072; *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004).

The Court examines the events leading up to the arrest and decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks and source omitted).  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Plaintiff was arrested for obstruction of a police officer and resisting arrest.  "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays or obstructs any law enforcement officer in the discharge of his or her official powers or duties."  RCW 9A.76.020.  "A person is guilty of resisting arrest if he or she intentionally prevents or attempts to

REPORT AND RECOMMENDATION
PAGE - 19

prevent a peace officer from lawfully arresting him or her."  RCW 9A.76.040.

In order to prevent an intrusion on an individual's First Amendment rights, Washington courts construe the obstruction statute narrowly and require some conduct to establish a violation. *E.J.J.*, 183 Wn.3d at 501-03.  "In other words, a conviction for obstruction may not be based solely on an individual's speech because the speech itself is constitutionally protected."  *Id*. at 502.  For example, in *E.J.J.*, 183 Wn.2d at 500-01, 505-08, the Washington Supreme Court overturned a conviction for obstruction where a defendant stood in front of his home and requested officers not use their nightstick on his sister, refused to comply with officers' requests to return to his house and close the door, repeatedly reopened the door after it was closed by officers, and became "irate, yelling profanities and calling the officers abusive names."  In contrast, in *State v. Lalonde*, 35 Wn. App. 54, 56, 665 P.2d 421 (1983), the Washington Court of Appeals upheld an obstruction conviction where the plaintiff approached officers attempting to place another person under arrest, "was told several times to get back, and was physically forced back when he approached," but continued to "reapproach and persisted in his attempt to 'keep things calm.'"  Noting his "conduct in reapproaching and conversing" with an officer in the midst of conducting an arrest and refusing to move back and being forced back, the court found the "offense did not arise from his speech, but from the acts which accompanied his words."  *Id*. at 61-62 (also observing plaintiff "tacitly admitted he was attempting to get the officers to stop what they were doing, at least long enough to allow him to 'keep things calm.'")

Here, in describing the basis for probable cause in the arrest report, Smith stated plaintiff "ran out of his residence . . . was belligerent and started yelling . . . to not conduct a traffic stop in front of his residence[,]" continued to yell after being told to not interfere and to stay back, "came back outside and despite being asked not to, inserted himself into the investigation, put his hand

in his right pocket, and created a serious officer's safety concern."  (Dkt. 23, Ex. 9 at 3); *see also* Ex. 17 at 1 (use of force report states plaintiff "voluntarily inserted himself into . . . and continued to delay" the investigation contrary to requests).)  Smith testified that, when plaintiff took steps towards the patrol car, he "technically [was] inserting himself" into, hindering, and delaying the investigation and Smith's official duties, both through the use of his "[v]oice and the way he's coming out and his aggressiveness and stuff like that."  (Dkt. 35 (First Decl. of Joe Shaeffer), Ex. 1 at 33:15-35:3)

Plaintiff denies any security risk or any hindrance, delay, or obstruction giving rise to probable cause.  He points to Smith's focus on his speech and the fact that, at the point plaintiff came back out of his house to record the incident on his phone, Smith had already concluded the stopped driver was not impaired.  He contends his speech, while standing on his own property and causing no more than a distraction and minor delay in completing "some stuff" before Smith could end the traffic stop, did not suffice to establish probable cause for obstruction.  *E.J.J.*, 183 Wn. 2d at 505, 506-07 (". . . E.J.J.'s mere presence at the scene cannot constitute conduct. E.J.J. had every right to stand on his own property, provided he did not physically interfere with police."; observing that, while an officer was eventually required to escort him back to his home, causing delay:  "That E.J.J.'s behavior may have caused a minor delay is of no import.")

Defendants assert plaintiff intended to interfere with the traffic stop, as demonstrated by his multiple requests that Smith move the stop, contact his supervisor, and provide his name and badge number.  They identify conduct providing probable cause for obstruction as the steps plaintiff took towards the patrol car, creating an unobstructed path and ability to gain access to the car and passenger and, considered in conjunction with variables such as the knife in his pocket, a tense and rapidly evolving situation leading Smith to leave his car and confront plaintiff.   Once

REPORT AND RECOMMENDATION
PAGE - 21

outside his patrol car, Smith became convinced plaintiff was not going to obey his commands and contends the security risk plaintiff posed drew his attention entirely towards plaintiff and away from the traffic stop. It was dark, Smith had no backup, and he was concerned about plaintiff's proximity to weapons, the safety of his ride-along, a still unresolved traffic stop, and his perception of plaintiff's erratic, potentially threatening behavior.

The undisputed facts show plaintiff began to walk closer to the passenger side of Smith's patrol car, delaying an almost completed traffic stop. The video evidence shows Smith promptly exited his patrol car as plaintiff stepped closer to its passenger side, consistent with the evidence of his training and contention plaintiff's conduct, not only his speech, hindered, delayed, or obstructed Smith from completing his duties. (Dkt. 29, Ex. 3 at 27:17-28:11 (Youngman testified waiting in the car for backup would have put Smith and his passenger at further risk, explaining officers are trained to not wait inside their vehicle when there is a threat outside because you may become trapped and unable to move or find extra cover if you have to defend yourself or others).) Plaintiff offers evidence contrary to Smith's depiction of a security risk and suggesting Smith's failure to properly de-escalate the situation. (Dkt. 44 (Second Decl. of Peter Helmberger), ¶2 & Ex. A at 29:1-14 (Dave Thomas, Program Manager for the International Association of Chiefs of Police and a retired police officer, testified he did not agree Smith would have felt compelled to act once plaintiff stepped towards the patrol car, rather than giving a clear, unequivocal order to stop and maintain a distance, and described Smith as "still real relaxed" when he came around the back of the car and looking as though he was pulling out a card to hand to plaintiff); Dkt. 41 (Dave Thomas Decl.), ¶¶2-3, 5 (Thomas attests best law enforcement practices call for mitigation of the threat of a weapon by yelling specific verbal commands to drop the weapon and show hands, and

to allow time for an individual to submit).)[4]

Plaintiff also questions the veracity of Smith's contention he saw plaintiff's knife before the tackle and arrest.  (*See* Dkt. 30, ¶8 ( "While he was approaching my vehicle, I noticed what appeared to be a folding knife in his front pocket as I could see the outline of the knife and the clip outside his pocket."))  That is, the encounter occurred late in the evening (approximately 9:45 p.m.), he was backlit by large floodlights on the front of his home, and it is not clear the dark colored metal clip of his folding knife would have been visible from his dark colored pants and loose-fitting shirt covering the top of his pants pocket.  (*See* Dkt. 23, Ex. 10 & 12; Dkt. 30, ¶3; Dkt. 40, Ex. 1.)  Smith never directed plaintiff to get rid of the knife or to hold up his hands, and he arguably appeared calm as he approached plaintiff with a piece of paper in his hand.  (Dkt. 23, Ex. 12-13;  Dkt. 41 & Dkt. 44, Ex. A.)[5]

Summary judgment is not appropriate "where genuine disputes of a material nature exist" regarding "the facts and circumstances within an officer's knowledge[.]"  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).  Here, issues of fact preclude a determination on probable cause for arrest and, therefore, a ruling in plaintiff's favor on summary judgment.  *See, e.g.*, *Duran*, 904 F.2d at 1378 (where a police officer denied any retaliatory motive and "honestly believed [an individual's] actions indicated that criminal activity might be afoot", the court erred

---

[4] Thomas also testified that, while he would put himself between a passenger and another individual if worried about the passenger, he did not think Smith "was worried about a safety factor at that time." (Dkt. 44, Ex. A at 29:19-30:13.)  He thought Smith appeared to be getting out to give plaintiff his card, particularly since, at that point, Smith did not suspect the stopped driver was impaired, the investigation was almost complete, and he was "getting ready to cut that individual loose."  (*Id.* at 30:13-24.)

[5] Plaintiff also points to various aspects of reports completed by Smith in support of his contention regarding the knife.  (*See* Dkt. 39 at 5 (discussing Dkt. 23, Exs. 9 & 17).)  Given the other factors addressed above, a close examination of these reports is not necessary.

REPORT AND RECOMMENDATION
PAGE - 23

in granting summary judgment given the material issue of fact as to whether the officer intended to hassle the individual as punishment for the exercise of First Amendment rights).[6]

Smith, for the same reason, is not entitled to summary judgment on plaintiff's First Amendment and Fourth Amendment unreasonable seizure claims.  That is, it remains to be determined whether or not the evidence supports a conclusion Smith had probable cause for obstruction and, if not, violated plaintiff's rights under the First Amendment.

3.   Excessive Force:

Defendants also seek dismissal of plaintiff's excessive force claim.  Plaintiff contends any use of force was excessive given the absence of probable cause and opposes dismissal of this claim.

A claim of excessive force in the course of an arrest is analyzed under the Fourth Amendment and its "'reasonableness' standard."  *Smith*, 394 F.3d at 700 (citing *Graham*, 490 U.S. at 395).  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and allow for the fact an officer may need to "make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  The question is "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them[.]"  *Id*. at 397.

In determining the reasonableness of an officer's actions, the court (1) assesses the severity of the intrusion on the individual's Fourth Amendment rights by considering the type and amount of force inflicted; (2) analyzes the government's interests by considering the severity of the crime,

---

[6] Defendants ask that the Court exclude the prosecutor's determination regarding probable cause because it is inadmissible opinion evidence and the existence of probable cause is a question of law not properly subject to expert testimony.  (Dkt. 43 at 11-12.)  The Court does not consider the prosecutor's determination in addressing the arguments on probable cause.

REPORT AND RECOMMENDATION
PAGE - 24

whether the suspect posed an immediate threat to the officer's or public's safety, and whether the suspect was resisting arrest or attempting to escape; and (3) balances the gravity of the intrusion against the government's need for that intrusion. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256-60 (9th Cir. 2017); *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). Other factors pertinent to this inquiry may include, for example, whether an officer issued a warning and whether less intrusive alternatives existed for capturing or subduing a suspect. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011); *Smith*, 394 F.3d at 701; *Deorle*, 272 F.3d at 1283-84. The Court must consider the totality of the circumstances. *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir.1995).

In sum, whether Smith's use of VNR was objectively reasonable turns on "whether the degree of force used was necessary; in other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282. Because the reasonableness balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," courts grant summary judgment in excessive force cases "sparingly." *Glenn*, 673 F.3d at 871. "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Drummond*, 343 F.3d at 1056 (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Whether or not the evidence in the record establishes liability on the part of the defendants depends on the resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences, all of which are manifestly the province of a jury.")). *See also Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("[T]he reasonableness of force used is ordinarily a question of fact for the jury.") However, a court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was 'objectively reasonable' under the circumstances."

REPORT AND RECOMMENDATION
PAGE - 25

1   *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (cited source omitted).

2          a.     <u>Type and amount of force inflicted</u>:

3        Plaintiff attests Smith tackled him to the ground, jumped on his back, unsuccessfully

4   attempted to pry or yank his pinned arms from beneath his body, and put him in a headlock,

5   whereupon he lost consciousness.  (Dkts. 40 & 42.)  Smith attests to his use of a VNR hold and

6   that the entire process, "the tackle, the hold, the tightening before he fell unconscious and regaining

7   of consciousness took a matter of seconds."  (Dkt. 30, ¶¶10-12.)  While defendants depict a very

8   brief hold and loss of consciousness, it remains that VNR is a serious use of force that could result

9   in death or serious injury.

10          b.     <u>Interest in the use of force</u>:

11        Considered as a general matter, the crimes at issue – the gross misdemeanor of obstruction

12   and the misdemeanor of resisting arrest – were not severe.  *See, e.g., Gravelet-Blondin*, 728 F.3d

13   at 1091 ("failing to immediately comply with an officer order to get back from the scene of an

14   arrest, when he was already standing thirty-seven feet away – was far from severe."); *Davis v. City*

15   *of Las Vegas*, 478 F.3d 1048, 1052, 1055 (9th Cir. 2007) (trespass and obstructing a police officer

16   by rotating away from and pushing off a wall towards an officer and engaging in a "brief pushing

17   and pulling match[,]" were not "such serious offenses" to have warranted force employed).  *Cf.*

18   *Smith*, 394 F.3d at 702 (domestic violence suspect was not "particularly dangerous," and his

19   offense was not "especially egregious").  It also remains to be determined whether probable cause

20   existed for obstruction and, as discussed below, facts relevant to the charge of resisting arrest are

21   in dispute.  "Where officers are presented with circumstances indicating that no crime was

22   committed, the 'severity of the crime at issue' factor is necessarily diminished as a justification for

23   the use of force[.]"  *Velazquez v. City  of Long Beach*, 793 F.3d 1010, 1024-25 (9th Cir. 2015).

REPORT AND RECOMMENDATION
PAGE - 26

Whether plaintiff posed an immediate threat to the safety of Smith or others is the "most important" factor under *Graham*. *Bryan*, 630 F.3d at 826 (citing *Smith*, 394 F.3d at 702). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. Also, "the 'desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.'" *Glenn*, 673 F.3d at 876-77 (quoting *Deorle*, 272 F.3d at 1281).

Smith identifies a threat to safety and a need to end the encounter quickly given variables such as not knowing whether plaintiff had a gun in the house he was going to retrieve, the knife in his pocket, Smith's need to protect his passenger and the other driver, and the absence of backup. However, plaintiff denies he was turning to go back to his house (Dkt. 40, Ex. 2 at 44:19-46:1) and Smith's concern about a gun is entirely speculative. Moreover, where plaintiff asked for the traffic stop to be moved because of his sleeping child and had already earlier returned to and reemerged from his house without a gun, this speculation could be found unreasonable. There is also, as discussed above, a dispute of fact as to whether Smith was aware plaintiff had a knife in his pocket before the tackle and arrest. A determination of whether plaintiff posed a threat to the safety of Smith or others requires credibility assessments and resolution of disputed facts.

The same can be said for resisting arrest. Smith contends plaintiff turned, pulled his arm away, began to head towards his house, and, once on the ground, continued to actively resist by trying to get up and struggle to get free, despite hearing the command to stop resisting. (Dkt. 30, ¶10; *see also* Ex. to Dkt. 45 (citizen observer stated plaintiff pulled away from Smith, tried to run away and continued to resist).) Plaintiff does not recall whether he pulled his arm away, but denies turning to go back to the house and explains he went into a defensive, prone position in response

1   to Smith's lunge and in an attempt to land on grass, rather than concrete.  (Dkt. 40, Ex. 2; Dkt. 42,

2   ¶¶3-5.)  Plaintiff also denies he resisted while on the ground, explaining his arms were trapped

3   underneath the weight of both his and Smith's bodies.  (*Id.*)

4          The video evidence does not support or refute either parties' position as to resistance.  (*See*

5   Dkt. 23, Ex. 13.)  Further, even if plaintiff moved his arm and later heard the command to not

6   resist, a reasonable juror, accepting his testimony, could find his movements a natural reaction to

7   being grabbed suddenly, without warning, and Smith's perception of resistance inaccurate in light

8   of plaintiff's inability to free his arms.  The existence or degree of resistance entails factual

9   disputes, requires a trier of fact to make credibility determinations, and precludes a finding at

10  summary judgment.  *See, e.g.*, *Brown*, 2019 WL 280296, at *10-11 ("Plaintiffs' evidence, if

11  believed, shows only that Brown threw elbows while he was face down on the ground and

12  squirming.  It is for the trier of fact, not this court, to determine the level of resistance posed by

13  Brown's movements and the level of resistance the defendant officers reasonably perceived

14  through those movements. At this juncture, the record suggests a reasonable jury could find

15  Brown's moving his elbows was a reaction to the officers' blows."); *Ericson*, 2016 WL 6522805,

16  at *16 (finding genuine disputes of material fact and credibility determinations necessary as to the

17  length of time the officer applied a carotid hold and whether the individual subjected to the hold

18  "was actually resisting arrest or, rather, reacting to the officers' use of Tasers.")

19         Other factors do not favor defendants.  Smith did not warn plaintiff prior to telling him he

20  was going into handcuffs, tackling him, and applying VNR.  *Deorle*, 272 F.3d at 1284

21  ("Appropriate warnings comport with actual police practice" and "such warnings should be given,

22  when feasible, if the use of force may result in serious injury."); *Gualillo v. San Francisco Police

23  Dep't*, C16-5584, 2017 WL 6059275, at *3 (N.D. Cal. Dec. 7, 2017) (all reasonable inferences

REPORT AND RECOMMENDATION
PAGE - 28

drawn in plaintiff's favor showed officer did not attempt any other hold before carotid restraint and did not attempt verbal persuasion or warn plaintiff he would take him to the ground if he did not cooperate); *Atkinson v. County of Tulare*, 790 F. Supp. 2d 1188, 1203-05 (E.D. Cal. May 18, 2011) (failure to give warning before carotid hold argued in favor of finding excessive force). Police officers must also consider the availability of other tactics to effect the arrest and the existence of "clear, reasonable, and less intrusive alternatives" militates against finding the force used reasonable. *Bryan*, 630 F.3d at 831. In this case, construing the facts in plaintiff's favor, a reasonable juror could find an absence of an exigency requiring the use of force and arguing in favor of mitigation tactics, such as the use of verbal commands and warnings, as well as waiting for backup. *Id.* (officer knew additional officers were en route and "was, or should have been, aware" their arrival "would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation without the need for an intermediate level of force."; finding failure to provide a warning prior to deploying taser and apparent failure to consider less intrusive means of effecting arrest factored significantly into the *Graham* analysis).

   c.   Balancing test:

The Court, finally, balances the gravity of the intrusion on plaintiff's constitutional rights against the need for the intrusion. This case involves a serious use of force, without warning, and the failure to use less intrusive alternatives. It also includes material factual disputes precluding determinations as to crimes committed, threats to safety, and resisting arrest. Given those disputes, the question as to the reasonableness of force used should be resolved by a jury.

   4.   Qualified Immunity:

Defendants argue Smith is entitled to qualified immunity because he did not violate plaintiff's constitutional rights and, even if the Court were to find a constitutional violation, the

REPORT AND RECOMMENDATION
PAGE - 29

constitutional rights were not clearly established at the time of the violation. However, the Court can determine the availability of qualified immunity on summary judgment only when the "'material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts.'" *Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (quoted source omitted). Where historical facts material to the determination of qualified immunity are in dispute, the court submits the issue to a jury. *Id.* "Put another way, while determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law." *Id.* at 1131 n.2.

Disputes of fact prevent determination of whether Smith violated plaintiff's constitutional rights. Those disputes include when Smith became aware of the knife in plaintiff's pocket, which Smith points to as a basis for his determination plaintiff posed a security risk and obstructed processing of the traffic stop, and the determination plaintiff posed a safety threat necessitating the force used. Other disputed facts include whether plaintiff resisted arrest, by turning away from Smith to retreat to his house or preventing Smith from restraining his hands after falling to the ground. These material disputes of fact preclude finding Smith entitled to qualified immunity.[7]

---

[7] The Court also observes that, in denying the existence of clearly established law, defendants characterize relevant facts in their favor. They, for example, distinguish cases involving force used on an individual who did not resist. *See, e.g., Tuuamalemalo*, 946 F.3d at 478. However, on summary judgment, a determination on clearly established law would require taking facts in the light most favorable to plaintiff, including, but not limited to, his assertion he did not resist. *See, e.g., Mena v. Massie*, No. 19-15214, 2020 WL 917316, at *2-3 (9th Cir. Feb. 26, 2020) ("On June 22, 2016, there was a body of clearly established law that put [an officer] on notice that it would be excessive force to use violence that is foreseeably likely to cause more than de minimis amounts of pain and injury against an arrestee where the crime is a non-violent misdemeanor and the arrestee (1) was not a threat to the officers or anyone else, (2) was not a flight risk, (3) did not resist (or at most passively resisted) being handcuffed, and (4) was not warned that the officer was going to use violent force before it was applied.") (citing *Gravelet-Blondin*, 728 F.3d at 1089-93; *Barnard v. Theobold*, 721 F.3d 1069, 1073 (9th Cir. 2013); *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1166-67 (9th Cir. 2011); *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)).

5.      Municipal Liability:

Defendants assert no basis for municipal liability due to the absence of a constitutional violation. *Jackson*, 268 F.3d at 653-54 (municipality cannot be "held liable under § 1983 where no injury or constitutional violation has occurred.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.")) Defendants also contend plaintiff's *Monell* claim should be dismissed given his failure to demonstrate that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404 (emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

However, it remains to be seen whether Smith violated plaintiff's constitutional rights or whether Pierce County may be found liable under its policy authorizing VNR in non-deadly force situations. *See Gravelet-Blondin*, 728 F.3d at 1096-97 (establishing municipal liability requires demonstration of a "'deliberate policy, custom, or practice that was the "moving force" behind the constitutional violation'" suffered; recognizing police department policy tends to affect officer behavior and finding a reasonable factfinder could conclude a policy authorizing an unconstitutional use of force was the moving force behind the force an officer employed); *Gibson v. County of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002) (liability can result where a municipality itself violated someone's rights or where a municipality is responsible for an employee's constitutional violation through its omissions even though its policies are facially constitutional), *overruled in part in Castro*, 833 F.3d at 1076 (clarifying an objective standard

"necessarily applie[s] to municipalities for the practical reason that government entities, unlike individuals, do not themselves have states of mind"); *Valenzuela*, 2019 WL 2949035, *10 (denying summary judgment where, viewing the evidence most favorably to plaintiffs, a reasonable jury could find a policy allowing for carotid restraint in non-deadly force situations amounted to a violation of constitutional rights and, where officers applied the restraint in accordance with the policy, could also find the policy was the moving force behind the violations). Nor do defendants address plaintiff's theory of municipal liability through ratification of Smith's unconstitutional actions. (*See* Dkt. 39 at 23-24.) Without determinations on those issues, summary judgment on plaintiff's *Monell* claims is not warranted.

CONCLUSION

For the reasons explained above, the Court recommends Plaintiff's Motion for Partial Summary Judgment (Dkt. 22), Defendants' Motion for Summary Judgment (Dkt. 28), and Plaintiff's Motion for Partial Summary Judgment on Probable Cause (Dkt. 34) be DENIED.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be

/ / /

/ / /

/ / /

REPORT AND RECOMMENDATION
PAGE - 32

1    ready for consideration by the District Judge on **February 26, 2021**.

2          DATED this 11th day of February, 2021.

3

4                                          _____
                                           Mary Alice Theiler
5                                          United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION
PAGE - 33